UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
Thomas P. DONOVAN, et al.,                  :
                                            :
                    Plaintiffs,             :          **OPINION AND ORDER**
                                            :
          -against-                         :          03-CV-2985 (DLI)(JO)
                                            :
Oskar P. LEWNOWSKI, et al.,                 :
                                            :
                    Defendants.             :
------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

This case is yet another unfortunate example of a litigant's misuse of the federal courts and

the Racketeer Influenced and Corrupt Organizations Act ("RICO") in an attempt to avoid the

judgment of a state court. Plaintiffs' complaint, filed on June 17, 2003, includes seven claims for

relief: (1) four claims under RICO; (2) one claim for common law fraud; and (3) one claim each for

violation of the federal and New York Fair Credit Reporting Acts. Defendants move to dismiss each

of these claims on the grounds that they: (1) are barred by collateral estoppel based on a prior action

adjudicated in state court; (2) are barred by the *Rooker-Feldman* Doctrine; (3) fail to state a claim

under RICO (as to the RICO claims); (4) are barred by the statute of limitations (as to the RICO

claims); and (5) fail to state a claim for common law fraud (as to the common law fraud claim).

Defendants also allege that the court lacks personal jurisdiction over three of the defendants.

        For the reasons set forth below, defendants' motion to dismiss is granted except as to the

claims brought pursuant to the Fair Credit Reporting Act.

**I.      Factual Background**

        Plaintiff Thomas Donovan is president of plaintiffs Secured Partners Corp. ("Secured

Partners") and First Secured Capital Corp. ("First Secured"). (Comp. ¶ 4). Through Secured

Partners and First Secured, Donovan has been involved in the business of purchasing and selling distressed mortgages for many years. (*Id.* ¶¶ 30-31.) In addition, together with his wife, plaintiff Pamela Donovan ("Mrs. Donovan"), Donovan acts as trustee for plaintiff Donovan Family Trust ("Donovan Trust"). (*Id.* ¶¶ 4-5, 8).

Beginning in 1997, Donovan, on behalf of First Secured, began discussions with defendant Thomas J. Ryan, III, who was the principal of Riverside Capital Advisors, Inc. ("Riverside"), concerning an arrangement whereby First Secured would borrow funds for investment in distressed mortgages. Riverside was the financial adviser to defendants Winchester Global Trust Company Limited ("Winchester") and Factored Receivables Trust ("Factored"). Winchester was the trustee of Factored. Defendant Highlands Financial Services, Inc. ("Highlands") has a relationship with Winchester which is somewhat unclear. What is clear is that Winchester, Factored, Highlands and Riverside were to be on one side of these transactions while First Secured, Donovan and the Donovan Trust were on the other.

First Secured ultimately entered into a somewhat complicated financing relationship with defendants. From December 1997 through July 1998, Factored advanced $7,618,655.86 in separate transactions to First Secured pursuant to the terms of a Loan Agreement entered into between Highlands as lender and First Secured as borrower (the "Loan Agreement"). Donovan, on behalf of First Secured, executed 45 separate promissory notes in favor of Highlands.[1] These promissory notes were later assigned to Riverside.

As collateral for the loans, Donovan executed a Limited Guaranty Agreement (the

---

[1] The purpose of the promissory notes was to ensure that First Secured would not be charged interest on any funds that had not yet been advanced, even if the advancement of those funds was contemplated by the Loan Agreement. Thus, the Loan Agreement operated as an "umbrella" pursuant to which the promissory notes were executed and the funds advanced.

"Guaranty") on behalf of the Donovan Trust. "To secure the Donovan Trust's obligations under the Guaranty, [Mr. and Mrs.] Donovan . . ., as trustees, executed a Stock Pledge . . . pursuant to which it pledged as collateral shares in First Secured, of which the Donovan Trust is the sole owner." Dec. at 35.[2] Under the terms of the Guaranty, unless certain events occurred, the scope of the Guaranty was limited to $400,000. One of the events which would trigger liability in excess of the $400,000 cap was "misappropriation of the Collateral Proceeds or the interests therein." Dec. at 35. The Collateral Proceeds are, among other things, the distressed loans, the real estate associated with the loans, and any proceeds from the disposition of same.

The purpose of all these machinations was to finance First Secured's acquisition of a portfolio of distressed loans while providing defendants with advantageous tax treatment. As Justice Warshawsky noted:

> When the court looks behind the face of these transactions as defendant suggests, it sees a group of investors in an off-shore trust trying to avoid taxes on the income of their investments, a very sharp financial advisor in Riverside (Ryan) who knows how to make things happen and get his piece of the pie, and an even sharper borrower and investor in Thomas Donovan who must have written the book on How to make Money with Other Peoples Money With No Risk, who knew exactly what he was doing.

Dec. at 46.

First Secured never repaid any of these funds in accordance with the Loan Agreement or promissory notes. Riverside and Winchester sued First Secured and the Donovan Trust over the

---

[2]     "Dec." refers to the Decision of New York State Supreme Court Justice Ira B. Warshawsky dated August 11, 2003. Justice Warshawsky presided over the prior state court action which is described in more detail below.

unpaid debt in New York State Supreme Court, Nassau County.[3]  Riverside and Winchester argued

that the Donovan Trust did not fulfill its obligations under the Guaranty.  First Secured and the

Donovan Trust argued that the Loan Agreement had been abandoned and was not in effect for

various reasons.  As affirmative defenses, First Secured and the Donovan Trust further argued that:

(1) the loans were unenforceable because the effective interest rates violated New York's criminal

usury laws; (2) Winchester lacked standing to maintain the action on behalf of Factored; and (3)

Riverside and Winchester could not maintain the action because Factored was a foreign entity

"doing business" in New York.[4]  First Secured and the Donovan Trust also counterclaimed that

Riverside and Winchester caused injury to them by failing to adequately fund the loans as promised.

        In support of their contentions, First Secured and the Donovan Trust offered the testimony

of Jon Tarbox.  Mr. Tarbox was an employee of Riverside during the time the transactions at issue

were carried out.  At some point after the transactions ceased, Riverside declared bankruptcy and

was purchased at auction by Entrust, a corporation controlled by Mrs. Donovan.  Tarbox was then

paid $60,000 to provide consulting services for Entrust.  Miraculously, Tarbox turned on his former

employer and testified on behalf of Donovan and First Secured in support of their contentions that

the Loan Agreement had been abandoned.  With respect to Tarbox's testimony, Justice Warshawsky

commented as follows:

            Mr. Tarbox has bent the truth, carefully and skillfully, with the intent
            to significantly support the [State Court] defendants' case.  He

_____

        [3]        Riverside sued in its capacity as investment advisor to Winchester and Winchester sued as trustee to
the Factored Receivables Trust, the successor in interest to Highlands.  Another corporation, Wet Resources Corp., and
Thomas Wynne, the attorney for First Secured, were also named as defendants in the state court action.

        [4]        New York's so-called "door closing statute" prohibits corporations "doing business" in New York from
maintaining an action in New York courts "unless and until such corporation has been authorized to do business in this
state and it has paid to the state all fees and taxes imposed under the tax law or any related statute...." N.Y. BUS. CORP.
LAW § 1312(a).  Presumably, this bar would apply to Factored's successors as well.

4

became an interested party, bought and paid for by the Donovans via his contract entered into with Mrs. Donovan's corporation, Entrust, which had purchased Riverside. His consulting contract with Entrust was entered into in November, 2002, the original time this trial was to have commenced.

Dec. at 21.

Following a twenty-two-day trial, the state court issued its decision. Justice Warshawsky found that the Loan Agreement and Guaranty were enforceable and First Secured and the Donovan Trust were in default. The state court further found that First Secured misappropriated the Collateral Proceeds, thereby triggering the Dovonan Trust's liability for the full amount of First Secured's debts. "First Secured, acting through its President and principal, Donovan, directed [First Secured's real estate lawyer, Robert O'Brien] to disburse monies representing proceeds of plaintiff Factored's collateral to no fewer than five other Donovan related entities bearing remarkably similar names to that of the defendant, First Secured Capital Corp." Dec. at 30.

Justice Warshawsky specifically rejected First Secured and the Donovan Trusts' arguments regarding the enforceability of the loans, finding that the loans were not usurious. In addition, the state court found that: (1) Winchester had standing to bring the action as the legitimate successor in interest to Factored Receivables; and (2) Riverside and Winchester had authority to "maintain" the action because Factored was not doing business in New York. As to this final finding, Justice Warshawsky rejected First Secured and the Donovan Trusts' theory that, because Winchester and Factored structured their activities to avoid tax liability, Factored was a foreign corporation owing back taxes and therefore prohibited from maintaining an action in New York pursuant to N.Y. Bus. Corp. Law § 1312 (see note 4, *supra*).

Finally, the state court rejected First Secured's and the Donovan Trust's counterclaim for a

"failure of proof."

## II.    Discussion

### A.    Rules of Preclusion

A federal court must accord a state court's final judgment the same preclusive effect it would

be entitled to by the law of the state in which it was rendered. *Migra v. Warren City School Dist. Bd.*

*of Ed.*, 465 U.S. 75, 81 (1984).  Accordingly, New York law will determine the preclusive effect of

the state court action on the instant matter.

"New York courts have adopted a transactional approach to res judicata, so that a final

decision on the merits on one action bars all subsequent claims arising out of the same transaction

or series of transactions, even if the claims are based on different legal theories or the party is

seeking a different remedy." *Resource N.E. of Long Island, Inc. v. Town of Babylon*, 28 F. Supp.2d

786, 791 (S.D.N.Y. 1998) (citations omitted); see also *Smith v. Russell Sage College*, 54 N.Y.2d 185

(1981).[5]  This doctrine applies both to claims asserted and claims that could have been asserted in

the prior action so long as the party to be precluded had a full and fair opportunity to litigate those

claims. *Schuykill Fuel Corp. v. B. & C. Neiberg Corp., et al.*, 250 N.Y. 304, 306-07 (1929) ("A

judgment in one action is conclusive in a later one not only as to any matters actually litigated

therein, but also as to any that might have been so litigated, when the two causes of action have such

a measure of identity that a different judgment in the second would destroy or impair rights or

interests established by the first."); *Santiago, et al. v. New York City Bd. of Health, et al.*, 779

---

[5]        Defendants have also argued that plaintiffs claims are barred by collateral estoppel.  Upon further
inspection, it is somewhat unclear whether defendants are actually making a "collateral estoppel" or "res judicata"
argument.  These are two different, but related, concepts. *See Kret by Kret v. Brookdale Hosp. Medical Ctr.*, 462
N.Y.S.2d 896, 899-901 (2d Dep't 1983).  The confusion is understandable, as many of the state and federal cases
discussing one concept or the other often conflate the two.  The type of preclusion which defendants seek here is more
akin to res judicata than collateral estoppel.

N.Y.S.2d 474, 476 (1ˢᵗ Dep't 2004). Moreover, the doctrine of res judicata applies not only to parties to the prior action, but to those in privity with those parties as well. *Spano v. Novello*, 788 N.Y.S.2d 205, 209 (3d Dep't 2004).

The determination of preclusive effect requires an examination of what was actually argued and ruled upon in the prior proceeding. As defenses to the enforcement of the promissory notes, First Secured and the Donovan Trust argued in state court that (1) the Loan Agreement was abandoned; (2) the effective interest rates on the loans were usurious; and (3) Factored and related entities were unable to maintain the action in New York state courts because their "investment plan was in furtherance of a deliberate tax avoidance plan."[6] First Secured and the Donovan Trust also pressed a counterclaim, the substance of which was that Riverside induced First Secured to commit with First Secured's clients to purchase various mortgages and then intentionally withheld the funding. The result of this, which Riverside allegedly knew or should have known, was to induce First Secured to default on its obligations to its clients causing it both monetary and reputational harm.[7]

---

[6] This final argument is not really separate from First Secured and the Donovan Trust's other arguments that Factored and related entities were doing business within the state of New York. Rather, this argument is nothing more than additional "evidence" that Factored and related entities were doing business in New York. New York's door closing statute requires that foreign corporations doing business in New York be current on their state taxes as a prerequisite to maintaining a lawsuit in New York courts. N.Y. BUS. CORP. LAW § 1312. Without having first established that Factored and related entities were doing business within the state of New York based on their activities, it is inconceivable that Factored and related entities could be doing business within the state of New York due to their failure to pay taxes stemming from those activities. This argument therefore reduces itself to a rather transparent attempt to smear the state court plaintiffs as offshore tax cheats. True or not, Donovan was well aware of the structure of the transactions before and during his dealings with Factored and related entities. Donovan made no complaint about this allegedly nefarious tax-evasion scheme while $7.6 million was flowing to his companies.

[7] The allegations related to the counterclaim go as follows: During the period between February 1998 through July 1998, Riverside contacted First Secured several times and instructed First Secured to locate and secure bid agreements to acquire mortgage packages and real properties owned by foreclosing banks. Riverside knew, or should have known, that First Secured was afforded the unique opportunity to acquire these assets by virtue of its reputation and relationships with First Secured's clients (various banking and mortgage servicing institutions). After First Secured had committed with its clients to a bid package in the amount Riverside wanted to invest, Riverside failed to deliver the promised funding, causing First Secured to default on its obligations to its clients. This was allegedly all part of

The first four allegations in the instant matter are made pursuant to the RICO statute (18 U.S.C. § 1961 *et seq.*). The RICO claims allege three basic activities. The first is identical to the counterclaim in the state court action referenced above (*see* footnote 7 for greater detail) with the added wrinkle that defendants allegedly used their position to demand concessions and changes in the Loan Agreement and sought to wrest control of plaintiffs' business. The Complaint alleges as predicate acts the use of interstate facsimile transmissions (predicate acts 1 through 8) and the U.S. Mail (predicate acts 9 through 15) in furtherance of this purpose. Predicate act 16 is the interstate use of Federal Express in the course of business by which defendant Highlands, as a nominee entity for Factored, participated in a scheme to defraud the Internal Revenue Service ("IRS"). Predicate act 17 alleges that defendants defrauded the Republic National Bank by obtaining a line of credit through various misrepresentations. This line of credit was purportedly used by Factored to fund the loans to First Secured. In addition to treble damages pursuant to 18 U.S.C. § 1964(c), costs and attorney's fees, two of the four claims for relief also request that debts be voided.

Plaintiffs' fifth claim for relief alleges common law fraud under New York law based on misrepresentations and omissions by defendants which caused plaintiffs to give up existing and future business relationships, incur expenses and costs, suffer a substantial loss of profits, and endanger or lose long term clients and good will.

With the exception of the claims under the state and federal Fair Credit Reporting Acts, plaintiffs' claims in the instant matter range from closely related to completely indistinguishable from their state court predecessors. Each of the claims stem from Riverside and Winchester's loans to First Secured and the Donovan Trust. These loans were made for the purpose of First Secured's

Riverside and Winchester's plan.

8

acquisition of distressed loans. In addition, the claims in both actions are temporally related in that the alleged wrongdoing in each case was complete when the parties' funding relationship terminated prior to filing the state court action.

> A 'cause of action' may denote one of several separately stated claims in a pleading based on the same congeries of facts but related to different legal theories of recovery. A 'cause of action' may also denote a separately stated claim on the same congeries of facts, but for different legal relief. But even if there are variations in the facts alleged, or different relief is sought, the separately stated 'causes of action' may nevertheless be grounded on the same gravamen of the wrong upon which the action is brought. In the sense of *res judicata* or claim preclusion, although there may be separately stated or statable causes of action, they are nevertheless based on the 'same cause of action', to which the consequential test defined in ... *Schuylkill* [*v. Fuel Corp. v Nieberg Realty Corp.*, 250 N.Y. 304 (1929)] ... applies. Nor will differences in legal theory generally avail to permit relitigation of claims based on the same gravamen....

*Reilly v. Reid*, 45 N.Y.2d 24, 29 (1978). It is clear that the first five causes of action, alleging violations of the RICO statute and common-law fraud, are based on the "same congeries of facts" as the claims, affirmative defenses and counterclaims in the state court action. *64 West Park Ave. Corp. v. Parlong Realty Corp.*, 354 N.Y.S.2d 342 (Sup. Ct. 1974) ("For purposes of determining Res judicata effect, a judgment rendered upon a counterclaim is no different than one made upon a primary claim in a complaint.").[8] Plaintiffs put it quite well on page 5 of their Memorandum of Law

---

[8]     The law in New York is somewhat unclear with respect to the preclusive effect of affirmative defenses. *See* 10 Weinstein, Korn, Miller, New York Civil Practice CPLR ¶ 5011.20-5011.21 (2d ed. 2004). At a minimum, collateral estoppel applies to any specific issues adjudicated in a prior action as affirmative defense. *Id.*; *Rosenberg v. Del-Mar Div., Champion Int'l Corp.*, 391 N.Y.S.2d 452 (2d Dep't 1977) (original suit for contract damages necessarily decided that no defense to payment existed such that subsequent suit by original defendant for breach of contract was barred by *res judicata*). This would certainly preclude plaintiffs' third claim for relief alleging collection of usurious debts. The state court specifically found the debts not usurious under New York law. Dec. at 47. Victory for the plaintiffs here would therefore require this court to overturn a specific finding of the state court. Moreover, although plaintiffs state that the debts are also usurious under federal law, plaintiffs cite only New York law in their complaint. Plaintiffs citation to "federal law" is insufficient to put defendants on notice of what claims they must defend. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (Defendant is entitled to "fair notice" of what the plaintiff's claim is and the grounds upon which it rests.)

with their statement that "the central factual allegations raised in this action. . . [are] that the defendants fraudulently sought to obtain plaintiffs' business and property, and in the process caused plaintiffs substantial damage."  This is precisely the claim that was dismissed by the state court for a failure of proof.

"Under the 'transactional analysis' approach adopted by the [New York] Court of Appeals, the doctrine of *res judicata* also operates to preclude the litigation of matters that could have or should have been raised in a prior proceeding arising from the same 'factual grouping,' 'transaction,' or 'series of transactions.'" *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir. 1997) (quoting *Bd. of Managers of Windridge Condominiums One v. Horn*, 651 N.Y.S.2d 326, 327 (2d Dep't 1996).  The "series of transactions" at issue here—the loans made by Factored and its related entities to Donovan-controlled entities—is unquestionably the same in both the state court and instant actions. Moreover, it is well settled that plaintiffs could have brought their common-law fraud and civil RICO claims in state court. *See Tafflin v. Levitt*, 493 U.S. 455 (1990) (holding that state courts have concurrent jurisdiction over civil RICO claims).  For these reasons, the common-law fraud and RICO claims are precluded as to the Donovan Trust and First Secured, who were parties to the state court action, and those in privity with the Donovan Trust and First Secured.  The court must therefore determine if Mr. and Mrs. Donovan and Secured Partners are in privity with the Donovan Trust and First Secured.

B.    Privity Analysis

As with the rest of the preclusion analysis, New York law governs whether privity exists here.  Privity "includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and

possible coparties to a prior action." *Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 277 (1970).

"Privity has also been found where a person so controlled the conduct of the prior litigation in which

they were interested such that the result is *res judicata* against them." *Ferris*, 118 F.3d at 126-27

(quoting *Tamily v. General Contracting Corp.*, 620 N.Y.S.2d 506, 509 (2d Dep't 1994)).

Donovan is the president of First Secured, of which the Donovan Trust is the sole

shareholder. Donovan is also the president of Secured Partners. The Complaint acknowledges that

Donovan owns or controls First Secured and Secured Partners. (Comp. ¶ 37.) In addition, the

Donovan Trust is controlled by two trustees—Mr. and Mrs. Donovan. Finally, Donovan is the sole

officer and shareholder of Secured Partners.[9] In other words, the only person behind any of these

entities is Donovan, with the possible exception of the Donovan Trust, in which case Donovan is

---

[9]     Counsel for Secured Partners did not know at oral argument whether Secured Partners had any officers, investors or controlling persons other than Donovan. However, counsel subsequently submitted a letter which stated as follows:

> [A]lthough Thomas Donovan was technically the only officer and shareholder of Secured Partners Corp., virtually all of the investments made by Secured Partners Corp. in the distressed mortgage business were made as joint ventures with as many as fifteen other investors. Notably, these investors actively participated in the operation of the respective joint ventures in which they were involved....

These mysterious "investors" in Secured Partners who exercised so much control over Secured Partners' business activities apparently had no title or official association with the company whatsoever, not even the title of "shareholder." In general, being an officer or shareholder of a corporation will be evidenced in some document (e.g., a stock certificate, corporate charter, by-laws, or minutes of meetings). Being an "investor" who "actively participate[s] in the operation of the" company, however, may not produce similar documentary proof. In any event, the court need not determine the degree of control or involvement of these other investors in order to make a determination that privity exists. These investors were apparently comfortable with Donovan as the sole officer and shareholder, which is enough for a finding of privity. *See e.g., Cullen v. Paine Webber Group, Inc.*, 689 F. Supp. 269, 278 (S.D.N.Y. 1988) (privity exists between a corporation and its officers for purposes of *res judicata*); *JSC Securities v. Gebbia*, 4 F.Supp.2d 243, 251 (S.D.N.Y. 1998) (same); *Caruso v. Candie's, Inc.*, 201 F.R.D. 306, 311 n.3 (S.D.N.Y. 2001) (wholly-owned subsidiary is in privity with its parent) (citing *In re Teltronics Servs. Inc.*, 762 F.2d 185, 191 (2d Cir. 1985)).

Counsel for Secured Partners has also argued that, because Secured Partners was not part of the transactions at issue and was "put on a shelf" at defendants' request, Secured Partners could not be in privity with Donovan, First Secured, or the Donovan Trust. This argument misses the point. It is not Secured Partners' participation in the transactions at issue that establishes privity, but rather the fact that Donovan and Secured Partners are one and the same. *See id.*

joined by his wife.

Mr. and Mrs. Donovan were present and active participants during the state court trial.[10] That proceeding sought repayment of millions of dollars of loan proceeds from both First Secured and the Donovan Trust. Finally, in the instant action, plaintiff First Secured was represented initially by Jeffrey Hulse, Esq., who also represented First Secured and the Donovan Trust in the state court action.[11]

In addition to the foregoing, it is clear that Mr. and Mrs. Donovan, First Secured, Secured Partners, and the Donovan Trust are operating as one cohesive unit. This court simply is not naive enough to believe that Entrust's purchase of Riverside, Tarbox's obtaining a consulting contract with Entrust, and Tarbox's decision to testify on behalf of First Secured and the Donovan Trust in state court were unrelated events. Mrs. Donovan's successful effort to procure Tarbox's favorable testimony on behalf of First Secured and the Donovan Trust is evidence that she was an interested party to the state court litigation.

Finally, plaintiffs' theory itself compels a finding of privity. After a recitation of the facts which allegedly support the RICO and common-law fraud claims, plaintiffs allege only a general injury to each of them. The Complaint does not specify how, for example, Secured Partners was harmed in a different way than the Donovan Trust or explain why Mr. Donovan's rights were infringed upon in a different way than First Secured. As for the $34 million which purportedly constitutes plaintiffs' injury, the Complaint makes no effort to apportion this sum amongst the various plaintiffs. Under such circumstances, privity is inescapable.

---

[10]     Justice Warshawsky noted that Donovan "was present, or one might say a presence during the entire trial and actively assisted his attorney at counsel table." Dec. at 2.

[11]     Mr. Hulse is no longer counsel for First Secured in this action.

12

In response to all of the above, plaintiffs argue that the "defendants rely only on the gratuitous statements tacked onto the end of the state court's decision in which the court purports to 'pierce the corporate veil' and suggest that they are essentially alter-egos of the entities that were actually named as parties in the action." Pls.' Mem. at 4. As set forth above, this statement is simply false. Plaintiffs begin to make a relevant argument with their statement that "both legally and factually the Donovans and Secured Partners are wholly separate from First Secured and the Donovan Family Trust." Unfortunately, plaintiffs offer no support whatsoever for this statement.

All parties to this case seem well adept at operating through corporate alter-egos. This practice may serve the Donovans well in other legal contexts, but it will not defeat a finding of privity here.

C.    Prior Opportunity to Litigate

Plaintiffs argue that they were denied a full and fair opportunity to litigate their claim in state court. The state court counterclaim which is indistinguishable from the theory associated with the first 15 predicate acts of plaintiffs' RICO claim was dismissed after trial for a "failure of proof." Plaintiffs argue that they did not have a full and fair opportunity to litigate this claim because the testimony of Donovan, which allegedly would have supported the state court counterclaim, was barred by the state court based on Donovan's failure to attend his scheduled deposition and his disregard of court orders. Notably, plaintiffs do not challenge as unjust or incorrect the state court's decision to bar Donovan from testifying.

Under the circumstances, plaintiffs had a full and fair opportunity to present their counterclaim. This court sees nothing unfair in barring the testimony of a witness (and *de facto* party) who refused to participate in a pretrial deposition and ignored court orders. The result might

be different if First Secured and the Donovan Trust had little or no affiliation with Donovan such that the consequences of his misconduct during discovery should not fairly be visited upon them. Donovan is the president of First Secured and trustee of the Donovan Trust. There is nothing unfair about imposing upon those entities, Mrs. Donovan and Secured Partners, the consequences of Donovan's actions. The fact that the counterclaims were dismissed for a failure of proof which might have been supplied by Donovan's testimony is of no moment.[12]

The court finds that plaintiffs' RICO and common-law fraud claims are barred under New York's principles of preclusion.[13]

### D. Statute of Limitations Under RICO

Plaintiffs' RICO claims are also untimely. "Civil RICO claims are subject to a four-year statute of limitations that begins to run 'when the plaintiff discovers or should have discovered the RICO injury.'" *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 35 (2d. Cir. 2002). Under plaintiffs' theory, injury was complete when the defendants withheld the promised funding and caused First Secured's default to its clients. This occurred at some point prior to the September 3, 1998 letter of Jeffrey Hulse, Esq., which stated as follows:

> This letter will advise you on behalf of my client First

---

[12]    The court also notes that allowing Donovan's claims to proceed here on the basis that he did not have an adequate opportunity to litigate them in the prior proceeding because his testimony was barred would have the effect of rewarding Donovan for ignoring court orders. Donovan, having created the basis for the inadequate opportunity to litigate, should not now be able to benefit from his misconduct.

[13]    It appears that plaintiffs brought this action in order to circumvent an unfavorable decision in state court—a tactic usually defeated by operation of the *Rooker-Feldman* Doctrine. However, because plaintiffs allege "some independent [federal] claim," in light of the Supreme Court's recent decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 125 S.Ct. 1517, 1527, 161 L.Ed. 454 (2005), this court expresses no opinion on whether plaintiffs' claims would also be barred under the *Rooker-Feldman* Doctrine. *See L.A.M. Recovery, Inc. v. Dep't of Consumer Affairs*, 377 F. Supp. 2d 429, 435 (S.D.N.Y. 2005) ("The question after *Exxon Mobil*, therefore, is whether a district court has jurisdiction to hear an 'inextricably intertwined' claim brought subsequent to a state court judgment, although the claim would fail under state law rules of preclusion, or whether subject matter jurisdiction over such a claim always is lacking.")

> Secured . . . that certain material defaults have occurred on the part of Riverside . . . and/or Highlands . . . which have resulted in substantial damage to my client, both monetary and to reputation. Major sources of mortgage acquisitions have been lost as a result of these defaults as well as hundreds of thousands of dollars of lost profit.
>
> Not once, but numerous times my client has entered into agreements to purchase mortgages upon your representations that funding of the acquisitions would be provided. Your failure to fund under the circumstances can be viewed only as a gross disregard for your responsibilities under the prevailing agreements.

Declaration of Adam S. Hakki In Support Of Moving Defendants' Motion To Dismiss, Exhibit I. This letter sounds very much like plaintiffs' theory in this matter.

Subsequent to the date of this letter, plaintiff and defendant entities entered into negotiations in an effort to repair their relationship. These negotiations were apparently unsuccessful, and in October of 1999 defendants sent default notices to First Secured for the unpaid debts. Plaintiffs now claim that the sending of the default notice was the act that placed plaintiffs on notice of their RICO claim. This argument ignores the fact that plaintiffs were well aware of their debt to defendants and First Secured's clients long before the default notice was sent. As the September 3 letter makes clear, at a minimum, plaintiffs were on notice that defendants might not fund their future acquisitions of distressed mortgages and had withheld funding in the past. It was the withholding of these funds and not the sending of a default notice that allegedly harmed plaintiffs by causing them to default on their obligations to third parties.

In response to the above, plaintiffs argue that (1) their RICO injury did not become ripe until the amount of damages became "clear and definite;" and (2) defendants "purported negotiations" fraudulently concealed the fraud from plaintiffs. In support of this first contention, plaintiffs cite *First Nationwide Bank v. Gelt Funding Corp.* for the proposition that "a cause of action does not

accrue under RICO until the amount of damages becomes clear and definite." 27 F.3d 763, 768 (2d Cir. 1994) (citing *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1106 (2d Cir.1988)).

First, it appears that plaintiffs' alleged injury was clear and definite when defendants withheld the allegedly promised funding prior to September 3, 1998. Plaintiffs' argument that subsequent RICO predicate acts continued to harm them after the September 3, 1998 letter was sent does not hold water. As explained above, it was the withholding of funds, and not the faxes, Fedexes, and mailings that allegedly constitute the other RICO predicate acts that harmed the plaintiffs and therefore put them on notice of their injury.

Second, the court disagrees with plaintiffs' contention that the "clear and definite" language from *First Nationwide Bank* cited above means that a RICO claim is not ripe until plaintiff knows the precise amount of damages. In *First Nationwide Bank*, the plaintiffs, lender banks, brought a RICO claim based on alleged misrepresentation by the defendants of the value of collateral for loans made by the plaintiffs. The RICO injury was the amount of uncollectible debt. This amount was not remotely determinable until the banks exercised their rights to collect on the debts and were frustrated in that collection by the deficient collateral.[14] Thus, it was not the fact that the amount was indeterminable that delayed accrual of the RICO injury in *First Nationwide Bank* but rather the fact that the plaintiff bank had not yet been injured by the defendant's misrepresentation until an unsuccessful attempt to satisfy the outstanding debt on the collateral was made.

As observed by the court in *In re Merrill Lynch Partnerships Litigation*, a case more applicable to the one at bar, *First Nationwide Bank* and the cases on which it relied "involv[ed] debt

---

[14] The logic here is apparent: notwithstanding the misrepresentation regarding the value of the collateral, the RICO plaintiffs in *First Nationwide Bank* had a realistic opportunity to collect from the debtor without the need to look to the allegedly deficient collateral. The misrepresentation regarding the value of the collateral would therefore have caused no harm to plaintiffs if they were able to collect in full from the debtor.

instruments which contain[ed] bargained-for remedies after default which the debtor [was] expected to pursue." 7 F. Supp.2d 256, 263 (S.D.N.Y. 1997). These remedies would have reduced the amount of plaintiffs' RICO damages (and therefore the amount that would be trebled under the RICO statute) by whatever was collected prior to the filing of the RICO action. Here, the plaintiff-debtors, as opposed to creditors in *First Nationwide Bank*, had no such remedies which would reduce their RICO damages.[15] The alleged injury in this case occurred when plaintiffs defaulted on their obligations to the third parties, a fact referenced in the September 3 letter. The post-September 3 negotiations are therefore more akin to settlement negotiations prior to the filing of suit. Such discussions do not toll the statute of limitations. *See e.g., Weber v. Geffen Records, Inc.*, 63 F. Supp 2d 458, 466-67 (S.D.N.Y. 1999) (concluding that defendants' allegedly deceptive settlement negotiations would not have deterred a reasonably diligent plaintiff from filing suit).

To the extent plaintiffs argue that the statute of limitations should be equitably tolled based on their reliance upon defendants' misrepresentations, that claim fails as well. This type of equitable tolling requires plaintiffs to bring the action "within a reasonable amount of time after the facts giving rise to the estoppel have ceased to be operational." *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1494 (2d Cir. 1995). This would have been in October 1999, when the default notice, or, as plaintiffs characterize it in their Memorandum of Law, "the coup-de-grace in defendants' efforts to take ownership and control of plaintiffs' distressed mortgage business," was sent. Plaintiffs offer no explanation for the nearly four-year delay from that point in bringing the instant claims. Moreover, First Secured was probably aware that its relationship with Factored, Riverside and

---

[15]    Plaintiffs could not have pursued bargained-for remedies under the Loan Agreement even if such remedies existed because plaintiffs' position at trial in state court was that the Loan Agreement had been abandoned and was therefore invalid.

Highlands had deteriorated such that no settlement was possible when those entities sued First Secured over the unpaid debt. Plaintiffs' counsels, who did not represent any of the defendants in the state court action, could not explain why the instant claims were not brought in state court. Finally, plaintiffs' fraudulent concealment argument is also belied by the September 3 letter. As set forth in that letter, defendants obviously did a very poor job of concealing the impact of their refusal to provide further funding to plaintiffs.

Plaintiffs' RICO claims accrued, at the latest, on September 3, 1998. In order to be timely, plaintiffs would have to have brought their RICO claim no later than September 3, 2002. Plaintiffs' Complaint, dated June 17, 2003, is therefore untimely as to the RICO claims. Plaintiffs' RICO claims are dismissed on this ground as well.

## III. Conclusion

For the foregoing reasons, plaintiffs' claims for relief 1 through 5, made pursuant to RICO and for common-law fraud, are hereby dismissed. Defendants argue, in a footnote, that personal jurisdiction does not exist over defendant Michael Asseff for purposes of the state and federal Fair Credit Reporting Acts claims. Apparently due to page limitations on their memoranda of law, the parties did not thoroughly address this issue. The court therefore requests that the parties file supplemental briefs to assist the court in determining whether personal jurisdiction exists over Asseff. A briefing schedule will follow.

SO ORDERED

Dated: Brooklyn, New York
        August 30, 2005

                        _____/s/_____
                                Dora L. Irizarry
                        United States District Judge